WAYNE CALHOON *et al.*, Plaintiffs-Appellants and Cross-Appellees, v. COMMUNICATIONS SYSTEMS CONSTRUCTION, INC., Defendant-Appellee and Cross-Appellant.

Fifth District No. 5—85—0242

Opinion filed February 6, 1986.

Harris, Lambert & Wilson, of Marion, for appellants.

Wilson & Cape, of Harrisburg, for appellee.

JUSTICE WELCH delivered the opinion of the court:

Plaintiffs Wayne and Shelbina Calhoon and Lawrence and Ina Fosse commenced this action against defendant Communications Systems Construction, Inc. (CSC), based on CSC's construction of a cable television transmission line across real property owned by the Calhoons and Fosses. After a bench trial, the circuit court of Johnson County entered judgment for the Calhoons in the amount of $528, and for the Fosses in the amount of $507, and ordered that CSC raise its cable line at least four feet over both parcels of land. The Calhoons and the Fosses appeal seeking removal of CSC's cable, poles and other equipment from their properties and damages for trespass. CSC cross-appeals from that portion of the judgment which requires CSC to raise its cable line.

The case arises from CSC's construction of a cable television line along the west side of Illinois Route 37 in Johnson County north of Goreville. The Calhoons' farm fronts the west side of Route 37 for

about half a mile; the Fosses' farm has about 531 feet of highway frontage north of the Calhoons' farm. On or about February 20, 1984, CSC began suspending its cable from Central Illinois Public Service Company (CIPS) poles along Route 37, first along the Calhoon farm, then along the Fosse farm. There is no dispute that the poles are located on private property and not on the right-of-way. CIPS had the benefit of an easement with respect to the poles. CSC and CIPS entered into a "pole lease agreement" which permitted CSC to use the poles subject to various technical requirements. The pole lease agreement required CSC to furnish CIPS with evidence that CSC had secured the necessary easements. It is undisputed that neither the Calhoons nor the Fosses granted CSC any easement or permission to construct the lines in question.

Mr. Calhoon testified as follows: He first became aware that CSC was suspending its line from poles on his property on February 20, 1984, when he saw the work in progress. He telephoned CIPS to see whether CSC had an agreement with CIPS to do the work. Then he telephoned David Weatherly, president of CSC, who said he would be there in one hour to shut the job down. When Mr. Weatherly arrived, Mr. Calhoon repeated his demand that the work be stopped. Mr. Calhoon also telephoned his attorney for advice regarding the extent of damages. Mr. Calhoon and Mr. Weatherly then agreed that CSC would pay $500 for damages, and Mr. Weatherly paid Mr. Calhoon with a check which bore the notation "damages." Mr. Calhoon deposited the check and was later notified that payment of the check was stopped. CSC's construction of the line on the Calhoon farm lasted another three full working days after February 20. Mr. Calhoon spoke with Curtis Miller, a CSC foreman, after February 20, though Mr. Calhoon did not further specify the date: Mr. Miller told him the construction would continue the next day; Mr. Calhoon replied that he would have him arrested; the next day, the workmen arrived and Mr. Calhoon telephoned the sheriff, who said the State's Attorney advised "that there was a statute *** and they advised me to let them go ahead and construct the line and *** I could file suit later." The Calhoons' catalpa tree was trimmed by CSC employees on February 20 before Mr. Calhoon realized workers were there. The tree had been trimmed previously by CIPS, but in Mr. Calhoon's opinion CSC had cut it more severely and damaged it. According to Mr. Calhoon, cable-to-ground clearance was 16 feet 2 inches at the center of his driveway. He voiced concern that if he ever needed to load his combines on trucks they would not clear the cable. In very muddy weather the combines rode on "tracks" and were hauled to the field on a flatbed,

which could pose a clearance problem. However, there had been no clearance problems as of the November 1, 1984, trial.

Mr. Weatherly admitted writing and delivering the $500 check marked "damages" and stopping payment on advice of counsel. He testified that when the construction began he believed CSC had the benefit of the CIPS easements under the pole lease agreement and CSC's franchise agreement with Johnson County. The afternoon of February 20, following the incident with Mr. Calhoon, Mr. Weatherly telephoned CIPS and was informed that CSC had no easement. Despite learning on February 20 that CSC had no easement on the Calhoon farm, Mr. Weatherly continued the construction on the advice of counsel that he was protected by a statute (Ill. Rev. Stat. 1983, ch. 34, par. 429.24.1).

Mr. Fosse also testified at trial. Mr. Fosse indicated no problems with cable-to-ground clearance. Mr. Fosse's major concern was the increased difficulty of mowing his lawn in the vicinity of a new pole and guy wire erected by CSC on his property along the cable line.

Curtis Miller, a CSC foreman, testified at trial regarding his initial belief that CSC had an easement on plaintiffs' property, and the information he thereafter received from Mr. Weatherly that CSC had no easement and that Mr. Weatherly believed CSC was protected by statute. Mr. Miller confirmed that he spoke with Mr. Calhoon after Mr. Weatherly had done so and that he informed Mr. Calhoon that CSC would continue to build despite his wishes.

Mr. Weatherly testified that CSC's cable was suspended 40 inches below the CIPS cable pursuant to specifications in the pole lease agreement which incorporated safety standards contained in the National Electrical Code. According to Mr. Weaterly, it would cost CSC $15,000 to move CSC's line and equipment across Route 37 or to bury it; other solutions would be even more costly.

The trial court entered judgment for the Calhoons for $528, and for the Fosses for $507, the difference apparently attributable to the testimony of Mr. Calhoon and Mr. Fosse regarding labor expended in cleaning the work sites. The court refused to order CSC to remove its equipment from the Calhoon and Fosse farms. After hearing plaintiffs' post-trial motion, the court modified the judgment, requiring CSC to raise its cable line at least four feet above the Calhoon and Fosse farms. The Fosses and the Calhoons appeal, arguing that CSC should be required to remove all of its equipment from their property and that the cause should be remanded for a hearing to fix damages for trespass. CSC cross-appeals from that portion of the judgment which requires it to raise its cable line.

 CSC now concedes that it had no right to be on plaintiffs' property. Should CSC have been required to remove its equipment from plaintiffs' property? CSC argues that what plaintiffs seek is essentially injunctive relief, which should be granted only on plaintiffs' showing of necessity and the inadequacy of any remedy at law, *i.e.*, damages in this case. CSC relies on the proposition familiar to cases where one landowner's construction encroaches upon the land of an adjoining landowner, that courts will refuse injunctive relief (*i.e.*, tearing down the construction) and leave the complaining party to his remedy at law (*i.e.*, damages), provided that the encroachment is slight and unintentional, the cost of removing it is great, and the corresponding benefit to the adjoining owner of removal is small. (*Stroup v. Codo* (1965), 65 Ill. App. 2d 396, 401, 212 N.E.2d 518, 520.) An encroachment is "intentional" if the owner either proceeded to construct after notice of the encroachment, or in ascertaining the boundary or completing the construction failed in the exercise of precaution so as to indicate a wilful disregard of the other owner's rights. *Stroup v. Codo* (1965), 65 Ill. App. 3d 396, 212 N.E.2d 518.

In the case at bar, we are satisfied that the cost of removing CSC's equipment from plaintiffs' property would be great, and the benefit to plaintiffs of doing so relatively small. The critical question is whether the encroachment was "intentional." CSC had actual notice of Mr. Calhoon's assertion that CSC had no right to build on the Calhoon farm on February 20, 1984, the first full day of construction, but contends that its legitimate doubts regarding the merits of Mr. Calhoon's position at the time of the construction rendered the encroachment "unintentional."

 ██ We cannot agree. CSC does not claim it had any right to be on plaintiffs' land. Mr. Calhoon protested early on in the construction, yet CSC persisted in completing the very structure it now claims is too expensive to move. On these facts, there is no reason to stray from the principles established in cases involving encroachments by adjacent landowners: One who knows of a claim to land which he proposes to use as his own proceeds at his peril if he goes forward in the face of protest from the claimant and places structures upon the land. (*Ariola v. Nigro* (1959), 16 Ill. 2d 46, 51-52, 156 N.E.2d 536, 540; *Tyler v. City of Haverhill* (1930), 272 Mass. 313, 316, 172 N.E. 342, 343.) Mere belief in one's right, no matter how honestly and reasonably entertained, is no justification for preventing removal of the offending structure, nor is great expense of removal, when there has been a deliberate invasion of a plaintiffs' title to real estate and protest, followed by resort to the courts to ascertain the legal rights of

the parties. (*Tyler v. City of Haverhill* (1930), 227 Mass. 313, 316, 172 N.E.2d 342, 343.) The encroachment will be deemed deliberate if made after due warning. (*Malchow v. Tiarks* (1970), 122 Ill. App. 2d 304, 312, 258 N.E.2d 811, 815; see *The Fair v. Evergreen Park Shopping Plaza* (1955), 4 Ill. App. 2d 454, 470, 124 N.E.2d 649, 656.) The duty of the courts is to protect rights, and innocent complainants cannot be required to suffer loss of their rights because of expense to the wrongdoer. (*Pradelt v. Lewis* (1921), 297 Ill. 374, 378, 130 N.E. 785, 787.) In the instant case plaintiffs insisted on their rights and were in no way at fault regarding the expenses subsequently incurred by CSC.

■■ CSC suggests that it should be protected from the expense of moving the cable line in question because of the disastrous effect such an order would have on the providing of cable television service in the affected area. CSC suggests that it is entitled to protection because of the nature of the service it provides. It has been said that the court will generally stay its hand in the public interest where it appears the private right will not suffer by the refusal of injunctive relief, where the damage to the complainant from denying the injunction will be slight, where the right invaded is unsubstantial, or where the injury is compensable in damages, whereas issuing the order may or would occasion public inconvenience. However, "the convenience of the public should not be allowed to influence the court to disregard the complainant's clear legal right \*\*\*. The public interest is that property rights, as guaranteed by constitutional and statutory law, be preserved against inroads, and injunctive relief against illegal appropriation of property cannot be defeated by any claim that the public interest requires it." 42 Am. Jur. 2d *Injunctions* sec. 59 (1969).

In sum, we conclude that the trial court had no discretion on these facts but to order that CSC's cable and equipment be removed from plaintiffs' property. This cause is reversed and remanded so that the court may enter an order to that effect.

■■ Plaintiffs also argue that this cause should be remanded for a hearing as to plaintiffs' continuing damages due to CSC's trespass. Plaintiffs argue: "The payment of damages only provides compensation for the trespass and damages done up until the date of the trial. Because continual trespasses occur each day, additional damages have accrued since the date of the trial and are continuing to accrue each day." Plaintiffs provide no authority in support of this contention. We have carefully examined the pleadings and the orders appealed from and conclude that the trial court awarded damages to plaintiffs as total damages rather than as damages up until the trial only. Further,

we do not find those amounts inadequate in light of the evidence at trial. A reviewing court will not disturb a trial court's finding as to damages unless manifestly against the weight of evidence. (*Pathman Construction Co. v. Hi-Way Electric Co.* (1978), 65 Ill. App. 3d 480, 490, 382 N.E.2d 453, 461.) We find no error here.

Plaintiffs also argue that the amount of damages the trial court awarded to the Calhoons was based on the $500 check on which Mr. Weatherly stopped payment, and that this amount was for damages for February 20, 1984, only. Mr. Calhoon's account at trial of his conversations with Mr. Weatherly supports this position. However, the trial court was not required to accept Mr. Calhoon's account, particularly since, as we have noted, the amount of damages awarded was not inadequate.

Plaintiffs also argue that the statute appearing as section 25.40.1 of "An Act to revise the law in relation to counties" (Ill. Rev. Stat. 1983, ch. 34, par. 429.24.1) is unconstitutional. The trial court held that it was constitutional. CSC admits on page 16 of its brief that it did not comply with that statute. Accordingly, we refrain from deciding the constitutional issue, as its decision is not essential to this case. See *Kujawinski v. Kujawinski* (1978), 71 Ill. 2d 563, 569-70, 376 N.E.2d 1382, 1385.

CSC has cross-appealed, contending that the trial court erred in ordering it to raise its line four feet above plaintiffs' farms. In view of our conclusion that plaintiffs are entitled to insist on removal of CSC's equipment from their property, the cross-appeal of CSC requires no further discussion.

For the foregoing reasons, the judgment of the circuit court of Johnson County is affirmed with respect to plaintiffs' damages; in all other respects the judgment is reversed, and this cause is remanded so that the trial court may enter an order consistent with the views expressed herein.

Affirmed in part, reversed in part, and remanded.

JONES and HARRISON, JJ., concur.